Page 1

1            IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2                     CHARLOTTE DIVISION
                                       )
3    UNITED STATES OF AMERICA,         ) Case No.
                                       ) 3:20-cv-00579-RJC-DCK
4                                      )
         Plaintiff,                    )
5                                      )
     V.                                )
6                                      )
                                       )
7    ARTHUR T. STOVER and GIGI         )
     STOVER,                           )
8                                      )
                                       )
9        Defendants.                   )
10
11
12
13
14
15
16
17           REMOTE VIDEOCONFERENCE DEPOSITION
18                          of
19                  ARTHUR T. STOVER
20               (Taken by Plaintiff)
21            Wednesday, June 1st, 2022
22                     10:34 a.m.
23
24
25      Reported by: Leslie Christian Lentkowski

Case 3:20-cv-00579-TEJ-DCK    Document 31-4    Filed 09/19/23    Page 1 of 35
www.CapitalReportingCompany.com    USA Exhibit D Page 1
202-857-3376

Page 2

```
 1    APPEARANCES:
 2    On Behalf of the Plaintiff:
 3        Benton T. Morton, Esquire (via videoconference)
          Dayana Blanco, Intern (via videoconference)
 4        Department of Justice, Tax Division
          555 4th Street, NW
 5        6th Floor
          Washington, D.C. 20001
 6        202-598-6285
          Benton.T.Morton@usdoj.gov
 7
      On Behalf of the Defendants:
 8
          Gregory Connor, Esquire (via videoconference)
 9        Connor Law Group
          5511 Capital Center Drive
10        Suite 180
          Raleigh, North Carolina 27606
11        919-237-9220
          gc@connorlaw.com
12
          Justin Moyer, Esquire (via videoconference)
13        Murray Moyer, PLLC
          8015-105 Creedmoor Road
14        Raleigh, North Carolina 27613
          919-846-6779
15
      Also Present:
16
          Rikki Williams, Concierge Tech (via videoconference)
17        Virtual Bailiffs
18
19
20
21
22
23
24
25
```

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 2 of 35
USA Exhibit D Page 2
www.CapitalReportingCompany.com
202-857-3376

1              E X A M I N A T I O N S

2    Witness                                              Page

3    Arthur T. Stover

4       By Mr. Morton                                        4

5       By Mr. Connor                                      100

6

7                 E X H I B I T S

8    Exhibit                                              Page

9    USA Exhibit 1 - Notice                               104

10   USA Exhibit 2 - Complaint                            104

11   USA Exhibit 3 - Defendants' responses               104

12   USA Exhibit 4 - Account transcript                   104

13   USA Exhibit 5 - Discovery request                    104

14   USA Exhibit 6 - Rule 26(a) initial disclosures       104

15   USA Exhibit 7 - Archive history transcript           104

16

17

18

19

20

21

22

23

24

25

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 3 of 35   USA Exhibit D Page 3
www.CapitalReportingCompany.com
202-857-3376

1                    P R O C E E D I N G S

2                    THE REPORTER:  Participating attorneys

3     recognize that all parties, including the witness and

4     court reporter, are participating remotely.  In lieu of

5     an oath administered in person, the witness will

6     verbally declare that their testimony in this

7     deposition is under penalty of perjury and will be the

8     truth, the whole truth, and nothing but the truth.

9                    Mr. Stover, do you agree?

10                    THE WITNESS:  Yes, I do.

11                    THE REPORTER:  Counsel stipulate that

12    all objections to the remote participation are waived.

13    Please state your name and indicate your agreement on

14    the record, and then we're ready to begin.

15                    MR. CONNOR:  This is Gregory Connor.

16    I stipulate that that is fine.

17                    MR. MOYER:  This is Justin Moyer.  I

18    also stipulate that's fine.

19                    MR. MORTON:  This is Ben Morton.  I

20    also stipulate that's fine.

21                         EXAMINATION

22    BY MR. MORTON:

23        Q.   Mr. Stover, my name is Ben Morton.  I'm an

24    attorney for the Department of Justice, Tax Division.

25    I'll be taking your deposition today for this case.

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 4 of 35
USA Exhibit D Page 4
www.CapitalReportingCompany.com
202-857-3376

1    How are you doing today?

2              A.    Fine, thank you.

3              Q.    Have you ever had your deposition taken

4    before?

5              A.    No.

6              Q.    So there are a few differences between a

7    deposition and a typical conversation.  I just want to

8    make you aware of this.  First, the court reporter is

9    attempting to transcribe everything that we say.  In a

10   normal conversation, folks might interrupt or talk over

11   each other, but here it's important that we wait for

12   each other to finish asking a question before the other

13   begins talking.  Do you understand this?

14             A.    Yes.

15             Q.    Second, because this is an oral

16   transcription, the court reporter cannot indicate head

17   nods or other gestures such as uh-huhs or uh-uhs, so

18   every answer needs to be verbal.  Do you understand

19   this?

20             A.    I do.

21             Q.    Okay.  Is there any reason such as being

22   under unusual stress; physical, mental condition; or

23   under the influence of any substances that would

24   prevent you or limit you today from giving truthful

25   answers to my questions?

Case 3:20-cv-00579-TEJ-DCK    Document 31-4    Filed 09/19/22    Page 5 of 35    USA Exhibit D Page 5
www.CapitalReportingCompany.com
202-857-3376

1          A.    No, sir.

2          Q.    I'm going to ask you questions and how you

3    understand them.  There's nothing wrong with asking me

4    to repeat a question or explain a term if you don't

5    understand my question.  However, if you answer my

6    question, I'm going to assume that you understood it.

7    Do you understand this?

8          A.    Yes.

9          Q.    So if you need clarification of my

10   question, you should look to me for clarification.

11   Feel free to ask.  Do you understand this?

12         A.    Yes.

13         Q.    Sometimes I might ask you a question in

14   which you aren't sure of the answer but you can

15   reference some document and answer the question with

16   certainty after you reference it.  For example, if I

17   ask you for the balance of your checking account on a

18   particular date and you can see the banking

19   statement -- you can ask to see the banking statement

20   before you answer it.  I can then decide whether to

21   show you the banking statement to get an exact response

22   or not provide it and get a less exact response.  Do

23   you understand this?

24         A.    Yes.

25         Q.    Finally, I'm entitled to what are

Case 3:20-cv-00579-TEJ-DCK    Document 31-4    Filed 09/19/22    Page 6 of 35
www.CapitalReportingCompany.com          USA Exhibit D Page 6
202-857-3376

1    considered complete answers.  That means an answer that

2    fully and completely answers my question.  For example,

3    if you had orange juice, toast, and coffee for

4    breakfast and I ask you what you ate for breakfast, if

5    you only answered "orange juice," that would not be a

6    complete answer, and you would not have properly

7    answered my question.  Do you understand this?

8            A.   Yes.

9            Q.   I noticed you were leaning in earlier

10   closer to what I presume is the speaker.  Can you hear

11   everything okay?

12           A.   I have a little hearing -- yeah, I'm fine.

13   I just lean in.  And I have glasses, so I'm getting

14   old.

15           Q.   Okay.  I just wanted to make sure that we

16   didn't have any issues there.

17                Would you state your name -- your full name

18   and spell your last name for the record, please.

19           A.   Arthur Todd Stover, S-t-o-v-e-r.

20           Q.   Do you have any other names -- nicknames,

21   trade names -- that you go by?

22           A.   No.

23           Q.   And you understand that your testimony here

24   is the same as testifying in court?

25           A.   Yes.

www.CapitalReportingCompany.com
202-857-3376

1          Q.   Are you prepared to answer my questions

2    today?

3          A.   Yes.

4          Q.   Is there anything that will prevent you

5    from giving me your full attention?

6          A.   Nothing.

7          Q.   Where are you right now?

8          A.   In a little conference room.

9          Q.   Is there anyone else in the conference room

10   with you?

11         A.   No.

12         Q.   What device are you on?

13         A.   I'm on a laptop.

14         Q.   Do you mind just picking it up and -- are

15   you able to swivel around the room so that we can see

16   the room just to make sure that nobody else is in the

17   room?

18         A.   Sure.

19                    (Witness shows room with laptop

20   camera.)

21         Q.   Thank you.  What did you do to prepare for

22   your testimony today?

23         A.   Reviewed the documents that you -- that we

24   have that you forwarded to us.

25         Q.   Got it.  What documents are those

1  specifically?

2          A.   They were the response to your questions,

3  and it was a transcript -- the transcript of -- the IRS

4  transcript.

5          Q.   Do you remember if it was an account

6  transcript?

7          A.   Yes.  Yes.

8          Q.   Okay.  For what year or years?

9          A.   I'm not exactly -- I'm not sure what the

10 years are.  It started from 2007, and I assumed it went

11 all the way to current, but I was reading the early

12 years, trying to refresh.

13         Q.   Got it.  So you focused mostly on the 2007

14 tax year?

15         A.   Yes.

16         Q.   Okay.  Did you discuss this deposition with

17 anyone?

18         A.   No.

19         Q.   Did you talk to any of your family members

20 about it?

21         A.   No, I haven't.

22         Q.   Okay.  Did you review your responses to the

23 United States' discovery requests in preparation for

24 the deposition today?

25         A.   Yes.

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 9 of 35
www.CapitalReportingCompany.com        USA Exhibit D Page 9
202-857-3376

1          Q.   I think you answered that, but I just
2     wanted to clarify.
3               Did anyone tell you what to say today in
4     your deposition?
5          A.   No.
6          Q.   Did anyone tell you something that you
7     should not say today in your deposition?
8          A.   No.  Tell the truth.
9          Q.   Did the documents you reviewed earlier
10    refresh your recollection for today's testimony?
11         A.   Yes.
12         Q.   I'm going to pivot.  I'm just going to ask
13    you a couple of personal background questions.  I ask
14    these of everybody that I depose.  I'm going to start
15    with personal and family history.  How old are you?
16         A.   58.
17         Q.   Are you married?
18         A.   Yes.
19         Q.   Who are you married to?
20         A.   Gigi Stover.
21         Q.   Is that your only marriage?
22         A.   Yes.
23         Q.   Do you have any children?
24         A.   Two daughters.
25         Q.   What is your address?

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 10 of 35
www.CapitalReportingCompany.com    USA Exhibit D Page 10
202-857-3376

1          A.    ██████████████    in Waxhaw, North Carolina

2     28173.

3          Q.    What is the highest level of education that

4     you've achieved?

5          A.    High school.

6          Q.    Where did you go to high school?

7          A.    Clarence, New York -- Buffalo, New York.

8          Q.    Have you taken any college courses or

9     classes?

10         A.    Well, I'm licensed for property and

11    casualty, life and health, securities, surplus lines,

12    so I have all my property and casualty licenses.  They

13    probably are at college level -- the certifications.  I

14    have to have that to sell insurance.

15         Q.    I understand.  To get those licenses, do

16    you have to take a class or a course?

17         A.    Yeah.  Yes.

18         Q.    What sort of -- what sort of classes?

19         A.    It's a long time ago.  It was a certain

20    amount of hours and then pass the state exam in a

21    timely fashion.

22         Q.    What state was that?

23         A.    New York originally.

24         Q.    What about now?

25         A.    North Carolina and South Carolina.

www.CapitalReportingCompany.com
202-857-3376

1       Q.   Do you have to take continuing education

2  courses?

3       A.   Yes.

4       Q.   What are those?

5       A.   Refresher courses, courses that make sure

6  we're up to speed on any new changes in the rules or

7  laws.

8       Q.   I'm going to pivot to your job history.

9  After you graduated high school, what was your first

10  job?

11       A.   Selling windows.

12       Q.   And then how long did you do that for?

13       A.   Not long.  A year maybe.

14       Q.   Okay.  And then after that?

15       A.   I got into the insurance business.

16       Q.   Okay.  What year do you estimate that was?

17       A.   '87.

18       Q.   And you were doing that in Buffalo?

19       A.   Yes.

20       Q.   How long were you doing that in Buffalo?

21       A.   About 24, 25 years until I left.

22       Q.   Why did you leave?

23       A.   Have you ever been to Buffalo?

24       Q.   Once.

25       A.   It's cloudy.  It's the weather.

www.CapitalReportingCompany.com   USA Exhibit 14 Page 12
202-857-3376

 1          Q.   Fair enough.  What year did you -- so you

 2     left Buffalo and then you moved where?

 3          A.   To Waxhaw.

 4          Q.   Is Waxhaw near Charlotte?

 5          A.   Yeah.  It's a suburb.

 6          Q.   And what year do you think you moved to

 7     Waxhaw?

 8          A.   2005.

 9          Q.   And when you moved to Waxhaw, did you stay

10     in the insurance business?

11          A.   Yeah.

12          Q.   Did you have any other sources of income

13     while you were selling insurance?

14          A.   Yeah.  I did network marketing for a while.

15     I was involved in LED lighting -- an LED lighting

16     business I started up.  Yeah.  That's it.

17          Q.   What was the network marketing?

18          A.   American Communication Network.

19          Q.   How long -- I'm sorry.  American

20     Communication Network, was that a corporation or an

21     LLC?

22          A.   Yeah.  That's a company here in Charlotte.

23          Q.   Okay.  So you're still involved with it?

24          A.   No, I'm not.

25          Q.   Why are you no longer involved with it?

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 13 of 35
www.CapitalReportingCompany.com   USA Exhibit 13   Page 13
202-857-3376

1          A.    The insurance industry frowns on that, and

2    I was told that I shouldn't be doing network marketing

3    with my licenses, so I stopped it.

4          Q.    When you stopped it, did you sell the

5    business?

6          A.    No.  I just stopped trying to enroll and

7    sell their products.  It wasn't a real successful

8    adventure.

9          Q.    How long were you involved with that?

10         A.    About a couple of years.  Maybe three or

11   four years total.

12         Q.    What years?

13         A.    2000 -- let me think here.  Probably around

14   the 2003 to 2008 range.  Something like that.  10

15   maybe.  I just want to be honest, I didn't really do

16   anything with it.

17         Q.    No, I appreciate that.  What was

18   LED lighting?

19         A.    Light-emitting diodes.  It's what you see

20   outside everywhere now.  I was a little ahead of the

21   curve.

22         Q.    Did you -- I'm sorry.

23         A.    The company didn't end up making it.

24         Q.    Was that a company that you owned?

25         A.    Yes.

www.CapitalReportingCompany.com     USA Exhibit 1 Page 14
202-857-3376

1          Q.   How long -- when did it start, or when did

2     you start it?

3          A.   I didn't research the dates.  I wasn't

4     thinking that way.  It would have been early 2000 when

5     we started it, and then we had a company and it folded,

6     and then we re-licensed it.  And then it probably made

7     it until around 2006, 2007 -- something in that range.

8          Q.   It sold LED lights?

9          A.   It never sold any but it was supposed to.

10          Q.   Do you own any businesses now?

11          A.   No.

12          Q.   Do you have an interest in any companies?

13          A.   No.

14          Q.   Are you a member or a manager of any LLCs?

15          A.   No.

16          Q.   Are you an officer in any company,

17     corporation, LLC, or partnership?

18          A.   Other than my insurance, no.

19          Q.   We'll come back to that.

20               Are you a partner in any partnership?

21          A.   No.

22          Q.   You mentioned that you were an officer in

23     your insurance.  What is your position in that?

24          A.   Owner -- owner/operator is kind of what I

25     call myself.

www.CapitalReportingCompany.com
202-857-3376

1          Q.    Okay.  So is that a business that you do

2     own?

3          A.    Yeah.

4          Q.    Because earlier I asked if you owned any

5     businesses and you said "no" to that.

6          A.    Well, other than -- I assumed you meant

7     other than the insurance.

8          Q.    Okay.

9          A.    I'm sorry.

10         Q.    How long have you been owner of the

11    insurance company?

12         A.    34 years.  I've been in the insurance

13    business 34 years.

14         Q.    Okay.  What's the name of it?

15         A.    The Stover Agency.

16         Q.    And when did you start that?

17         A.    2006, maybe 2000 -- I had the Buffalo

18    office and we moved to Charlotte, and for about a year

19    I kept the Buffalo office and just lived off that and

20    was deciding what I was going to do.  And then my wife

21    -- I bought another Allstate office here, but we bought

22    it in my wife's name.  After about a year, then she

23    signed it back over to me.  So I've been in the

24    insurance business 34 years.  I owned one in Buffalo.

25    And then for about a year, it looks like I didn't own

USA Exhibit 16 Page 16
www.CapitalReportingCompany.com
202-857-3376

```
 1   one, and then I have the Charlotte office today in my

 2   name since probably 2000 -- I don't even know what date

 3   exactly.

 4         Q.   About 2006 to the present?

 5         A.   Yeah.  Yeah.  Something in there.  Yeah.

 6         Q.   What type of insurance do you sell there?

 7         A.   It's Allstate -- auto, home, life, life

 8   investments.

 9         Q.   What is that last thing that you said?

10         A.   Life investments -- life insurance and

11   disability and things like that, long-term care.

12         Q.   What are your duties in the business?

13         A.   Sales.

14         Q.   Anything else?

15         A.   I do it all.  I run the whole show.  I

16   oversee, setup leads, close.

17         Q.   Do you do -- who does the accounting for

18   the business?

19         A.   Probably our CPA.

20         Q.   Who is that?

21         A.   John -- I forget his last name.

22         Q.   Hess?

23         A.   Hess.  Thank you.

24         Q.   How long have you -- how long has John Hess

25   been your CPA for the business?
```

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 17 of 35
www.CapitalReportingCompany.com   USA Exhibit 17 Page 17
202-857-3376

1          A.    Pretty much -- well, let's see.  We had Ed

2    Lloyd and then -- probably 10 years.

3          Q.    Who is Ed Lloyd?

4          A.    Ed Lloyd was my first CPA.

5          Q.    How long did you -- what years did you use

6    him and his services?

7          A.    Well, we moved in '05, so it would be 2005

8    or -- I don't know.  Maybe four or five years we used

9    him.

10         Q.    So around 2005 to 2009?

11         A.    Yes.

12         Q.    Why did you stop using him?

13         A.    We couldn't afford him.  We couldn't pay

14   his bill.

15         Q.    Is your wife involved in your insurance

16   business?

17         A.    She helps me with it and supports the team.

18         Q.    Is she paid a salary?

19         A.    No.

20         Q.    How does she help?

21         A.    Well, she answers phones on days like today

22   where we're shorthanded, and she works and helps with

23   our leads, the leads that we generate -- stuff like

24   that, the side stuff, computer technology.  She sets up

25   my phones, makes sure I can get on Zoom meetings.

Case 3:20-cv-00579-TEJ-DCK    Document 31-4    Filed 09/19/22    Page 18 of 35
www.CapitalReportingCompany.com    USA Exhibit 18 Page 18
202-857-3376

1          Q.   Gotcha.  Did you ever have any investment

2    properties?

3          A.   We had a duplex in Buffalo -- or in Orchard

4    Park, New York, that we lived in.  And then when we

5    moved to Charlotte, it became an investment property.

6    And then there were two little condos in Myrtle Beach

7    that I had started the process -- had purchased them --

8    started it.

9          Q.   What were the condos?  Were those for

10   renting?

11         A.   Well, it was an existing condo complex that

12   a builder was selling units, and then they were

13   upgrading the units.  When the market -- when things

14   went bad, that builder foreclosed on the whole deal, so

15   anybody that had invested in it had lost.  We never

16   actually rented.  It never got to that point.  It never

17   was able to be rented.

18         Q.   When were those condos foreclosed on?

19         A.   Foreclosed on?  I don't know.

20         Q.   I mean, if you had to guess, was it 2012?

21         A.   Yeah.  I would think it probably took a

22   while.  '11, '12 -- something in that range.

23         Q.   Okay.

24         A.   If I had to guess.

25         Q.   And when did you acquire an interest in

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 19 of 35
USA Exhibit 19 Page 19
www.CapitalReportingCompany.com
202-857-3376

1    those condos?

2           A.    Let's think here.  2007 or '08.

3           Q.    What about the duplex in Buffalo?  When did

4    you acquire that?

5           A.    '97, '96.  My daughter was born in that

6    house, so '96 maybe.

7           Q.    Do you still have it today?

8           A.    No.

9           Q.    What happened to it?

10          A.    We foreclosed on it.  They foreclosed on

11   it.

12          Q.    Who is "they"?

13          A.    "They," the mortgage company.  I was unable

14   to keep it up.

15          Q.    Understood.  What year was that?

16          A.    What year was -- what was the question?

17   I'm sorry.

18          Q.    What year did that foreclosure happen?

19          A.    I would be guessing.  It takes a long time.

20   It's New York State.  It was a process.

21          Q.    Okay.

22          A.    Six or seven years ago -- something like

23   that.

24          Q.    Gotcha.  Are you familiar with the

25   allegations in this lawsuit?

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 20 of 35
www.CapitalReportingCompany.com   USA Exhibit 1 Page 20
202-857-3376

 1          A.    Yes.

 2          Q.    That you owe -- you and your wife owe

 3    income tax taxes for the 2007, 2010, 2011, 2012, 2013,

 4    and 2014 tax years?

 5          A.    That's what we're here to talk about, yes.

 6          Q.    I just want to break down -- let's talk

 7    about each of those tax years.  For 2007, did you file

 8    tax returns for the 2007 tax year?

 9          A.    Yes.

10          Q.    Did you self-report any income tax

11    liability?

12          A.    I don't understand that question.

13          Q.    On your tax returns that you filed, did you

14    report any income tax liability?

15          A.    That I owed the IRS money?  Yes.

16          Q.    Do you remember how much?

17          A.    Well, 163,000 some-odd dollars.

18          Q.    Did anyone help you with your 2007 taxes?

19          A.    Our CPA did our taxes for us.

20          Q.    And was that Ed Lloyd?

21          A.    Yes.

22          Q.    Was it Ed Lloyd specifically, or was it --

23    is Ed Lloyd -- let me back up.

24                Is Ed Lloyd a solo practitioner or is it

25    multiple accountants?

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 21 of 35
www.CapitalReportingCompany.com         USA Exhibit 1 Page 21
202-857-3376

1        A.   I don't know.  He's got a lot of people

2   floating around -- helpers.

3        Q.   So was it Ed Lloyd who helped you with your

4   2007 taxes or was it one of his employees?

5        A.   A little bit of both.  Ed oversaw

6   everything.  We were always working, getting paperwork

7   to someone else.

8        Q.   Understood.  What did they do to help you

9   with your taxes?

10        A.   They did them.

11        Q.   What does that mean to you?

12        A.   That means that when it's time, I get an

13   appointment.  After we filed our extensions, which is

14   kind of the way we run, then we go through it, make

15   sure the numbers make sense and finalize it, put it

16   through.

17        Q.   So you requested an extension of time to

18   file for the 2007 tax year?

19        A.   Yeah.  We do that pretty much every year.

20        Q.   And then when would you have filed them?

21        A.   Well, it would have been the end of 2008,

22   October -- or whenever the end of the closeout is.

23        Q.   Okay.  I'm going to introduce an exhibit on

24   Exhibit Share.  It's going to be the complaint in this

25   case.  I'll let you know once I've uploaded it, and

Case 3:20-cv-00579-TEJ-DCK    Document 31-4    Filed 09/19/22    Page 22 of 35
www.CapitalReportingCompany.com        USA Exhibit 12 Page 22
202-857-3376

1    then you can -- I find that the best way is if after I

2    upload it, you refresh Exhibit Share, and then it

3    should come up.  It should come up as Exhibit 2.

4              It's uploaded now if you want to refresh

5    and try to pull it up.

6         A.   All right.  I see it.  Do you want me to be

7    back on the -- oh, okay.  I see it.

8         Q.   Okay.  This is United States Exhibit 2 for

9    this deposition.  Would you take a moment just to --

10   it's four pages long.  Just take a moment to review the

11   four pages, and then let me know once you have.

12        A.   Okay.  You said just the first four pages?

13        Q.   Yes.

14        A.   All right.  I'm done.

15        Q.   Okay.  I want to draw your attention to

16   Page 2 of the complaint.  There's a table in the bottom

17   half of the page.  I'm focusing on "Amount of

18   Assessment" for the 2007 tax period.  Do you see that

19   number?

20        A.   Yes, I do.

21        Q.   And that's $162,541?

22        A.   Yes.

23        Q.   And there's a second assessment, $3,484?

24        A.   Yes, sir.

25        Q.   Do you have any reason to believe those

Case 3:20-cv-00579-TEJ-DCK    Document 31-4    Filed 09/19/22    Page 23 of 35
www.CapitalReportingCompany.com        USA Exhibit 2 Page 23
202-857-3376

1  numbers are wrong?

2        A.   No.

3        Q.   Looking at the numbers, the amounts of the

4  assessments for the 2010 through 2014 years on this

5  table, there -- what strikes me is that they're

6  significantly lower than the 2007 year.  Do you agree

7  with that?

8        A.   Yes.

9        Q.   Why was 2007 so much higher?

10        A.   That was when we closed on the Buffalo

11  agency.

12        Q.   Okay.  Can you describe that for me?  What

13  happened?

14        A.   We sold it, and then when the monies

15  changed hands, that became part of my income, and at

16  the end of the tax year, it looked like I made gobs of

17  money that year.

18        Q.   Who did you sell to?

19        A.   I sold it to two separate entities in

20  Buffalo.

21        Q.   Who is that?

22        A.   Mark Bugenhagen, and I forget the name of

23  the other fellow.  The book was too big.  Allstate

24  wouldn't let one agent buy it.  They made us split it

25  up to sell it.

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 24 of 35
www.CapitalReportingCompany.com   USA Exhibit 4 Page 24
202-857-3376

 1          Q.   Got it.  So The Stover Agency in Buffalo,

 2   was that an LLC or a corporation?

 3          A.   It was an LLC, I believe.

 4          Q.   How much did you sell it for?

 5          A.   1.6 maybe, 1.4.  I apologize.  I never

 6   thought to refresh how much I actually sold it for.  I

 7   think in my head I stick with 1.6 is what I would say.

 8          Q.   That's fine.  That's your best guess --

 9          A.   Yes.

10          Q.   -- sitting here?

11          A.   Sitting here, yeah.

12          Q.   So you sold it for more than a million

13   dollars, and then that caused your taxes to be higher

14   for 2007?

15          A.   Correct.

16          Q.   Where did the proceeds for that go?

17          A.   There was some debt on the agency that had

18   to be paid off, and then whatever was left after that

19   is what we took out -- we took with us.

20          Q.   Okay.  Why didn't you pay the taxes with

21   some of those proceeds?

22          A.   Well, our intention was to pay the taxes.

23   It was a timing thing.  By the time the taxes were done

24   and we saw the liability, you know, the stock market --

25   the money we had invested in the stock market, we had

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 25 of 35
www.CapitalReportingCompany.com     USA Exhibit 15 Page 25
202-857-3376

1   to put it somewhere.  The housing was starting to be

2   affected, and once we saw the liability, we set an

3   appointment up with our CPA after the holidays to see

4   what we could do -- our options -- with the intent to

5   pay it.  That was fully our intent.

6         Q.   When did you set up that appointment with

7   the CPA?

8         A.   Set up -- well, the first quarter of 2009.

9         Q.   What did your CPA tell you?

10        A.   The CPA -- you know, we weren't offended by

11  the number.  We were prepared to pay it.  It really --

12  you know, I probably complained that it was too big a

13  number, but it is what it is.

14        Q.   Did you talk to your CPA before then?

15        A.   Before what?  Before when?

16        Q.   Did you talk to your CPA about the

17  liability in 2008?

18        A.   Well, no, because there wasn't one yet

19  until he did the taxes.  And by the time we saw it,

20  then -- well, we knew there was a tax bill.  We were

21  kind of -- we were prepared for it mentally.

22        Q.   So earlier you said in 2000 -- you

23  typically file an extension of time to have your taxes

24  done, and then you go in for an appointment with your

25  CPA.  And that was Ed Lloyd, right?

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 26 of 35   USA Exhibit 26 - Page 26
www.CapitalReportingCompany.com
202-857-3376

1        A.    Correct.

2        Q.    What did you talk about in that

3   appointment?

4        A.    We had a regular -- we would go through

5   everything.  It was done ahead of time too.  We would

6   send docs to him or whatever.  We would -- my

7   appointment to go was kind of to complete the process.

8   It wasn't to cache through it all.  At that point, it

9   was pretty much decided on.

10        Q.    Got it.  And so were you aware of the tax

11   liability when you filed the tax return in late 2008?

12        A.    No.

13        Q.    Were you aware that you would have reported

14   -- what was it -- roughly $160,000 in taxes?

15        A.    Yes.  When we had our appointment, that's

16   when I found out.

17        Q.    And that would have been in 2008?

18        A.    That appointment would have been early

19   2009.

20        Q.    Before you -- when you filed the return,

21   did you look at it?

22        A.    Yeah.

23        Q.    Did Ed Lloyd or somebody at his office talk

24   to you about it?

25        A.    I'm sure, yes.

www.CapitalReportingCompany.com
202-857-3376

1          Q.    And you had to sign the return, didn't you?

2          A.    Yes.

3          Q.    Did you look at the amount of income tax

4     reported when you signed it?

5          A.    Yes.

6          Q.    So you knew -- and you would have signed it

7     in 2008?

8          A.    Probably the end of 2008, yes.

9          Q.    Okay.  So you knew in 2008 that you had a

10    $160,000 tax bill coming?

11         A.    Yes.

12         Q.    Okay.  When that happened, did you make any

13    plans for it?

14         A.    Well, we made an appointment with my CPA,

15    and somewhere through that process in the first quarter

16    to the middle of the year of 2009, we sent -- it got

17    over our head, and we decided that we needed -- that's

18    when we actually hired -- or whatever phrase you use,

19    but we brought them on board with the power of attorney

20    in that middle of 2009.

21         Q.    What did you expect them to do?

22         A.    Nothing.  I wasn't expecting them to do

23    anything, I don't think.  I was just -- well, what was

24    happening, the money in the stock market was dwindling

25    fast, and we got to a point where it wasn't going to --

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 28 of 35
www.CapitalReportingCompany.com              USA Exhibit 28 Page 28
202-857-3376

1    we weren't going to be able to pay it and survive,

2    literally.  That's when we had Ed -- we signed the

3    power of attorney and got some professional advice.

4          Q.   What advice did you get?

5          A.   Well, what advice?  In 2009, he rolled out

6    what his plan was.  He was going to reach out to the

7    IRS and make contact and find out what our options are.

8    Really at that point, we knew we couldn't pay it lump

9    sum, you know, so we were depending on him.  I'm not

10   sure what I was expecting.

11         Q.   You said you knew you couldn't pay it lump

12   sum?

13         A.   Yes.  In 2009 with the way things were

14   going, it wasn't going to happen, and that's when we

15   went to Ed and said, "Listen, we need some -- we need

16   to get you to help us and reach out."  It's very

17   stressful, of course.  So the power of attorney, to me,

18   was a way to let the smartest guy in the room handle my

19   issues and allow me to keep working to try to get

20   through it.

21         Q.   Did you ever discuss paying the taxes over

22   a series of smaller payments?

23         A.   I don't believe so.

24         Q.   So you hired Ed Lloyd.  What did you -- so

25   I'm just confused.  You hired them and you said you

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 29 of 35
www.CapitalReportingCompany.com   USA Exhibit 2 Page 29
202-857-3376

1  didn't expect them to do anything.  What --

2          A.   I didn't know what to expect.

3          Q.   Well, did they tell you what they were

4  going to do?

5          A.   Yeah.  Yeah.  They were going to reach out

6  to the IRS, see if there's any sort of arrangements

7  that can be made -- a pay schedule.  And that's kind of

8  where we let them go and said, "Yes.  See what you can

9  do.  See what our options are."

10         Q.   You mentioned a pay schedule.  What do you

11  understand that to mean?

12         A.   To see if there's some way to -- other than

13  a lump sum, to make a payment, you know, to satisfy the

14  IRS.

15         Q.   Like a series of smaller payments over

16  time?

17         A.   Well, I wasn't sure.  I mean, I didn't

18  know.  I don't know what I was thinking at the time.

19  Probably.  Actually, I was probably hoping for a bunch

20  of series of payments spread out over a long period of

21  time.

22         Q.   Earlier I asked if you had discussed doing

23  a series of payments over time to resolve your tax

24  liability; is that right?

25         A.   Yeah.  You know, I'm not sure if I knew how

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 30 of 35
www.CapitalReportingCompany.com   USA Exhibit D Page 30
202-857-3376

1    it worked, you know, at the time, you know, that there

2    is such a thing.  I don't remember exactly how the

3    light went off to me that there was something.  I don't

4    remember that, like, on the timeline.  But I knew that

5    with the way things were going, the house prices -- our

6    equity was gone in our house.  Our money was dropping

7    ridiculously through Merrill, and we just knew that I

8    couldn't pull the money and pay the bills and survive,

9    so then I went to Ed and said, "All right.  Help me

10   out, Bud."

11          Q.   Okay.  That wasn't my question.

12          A.   I'm sorry.

13          Q.   My question was do you remember me asking

14   that question earlier?

15          A.   Yes.

16          Q.   And then you described that -- you said

17   "no" to that, right?

18          A.   Repeat the question again.  I apologize.  I

19   feel like I might have lost where you were trailing on

20   this.

21          Q.   Earlier I asked whether you had discussed

22   with Ed Lloyd & Associates a series of smaller payments

23   over time to resolve your tax liability, correct?

24          A.    No.  I was referring to when I said that

25   that we were talking about some sort of -- whatever

Case 3:20-cv-00579-TEJ-DCK    Document 31-4    Filed 09/19/22    Page 31 of 35
www.CapitalReportingCompany.com          USA Exhibit 1 Page 31
202-857-3376

1   options.  I don't even know at that time if I even knew

2   a pay period or pay schedule or anything.  Honestly I

3   was just -- what does a tax payer do when he's like

4   this?  That's the advice I was looking for Ed -- wise

5   counsel.

6        Q.   Gotcha.  And he said -- he advised you of

7   some sort of payment plan over time?

8        A.   Yeah.  But I don't know how long that

9   conversation took to get to that conversation.  It kind

10  of borders together a little bit.  But, yeah, somehow

11  like that.  It worked similar to that.

12       Q.   Okay.  What date did that conversation

13  happen?

14       A.   Well, it had to be in, like, May, June, or

15  July of '09 because the power of attorney was signed

16  in, like, I think June or July that year.

17       Q.   How do you figure that?

18       A.   How do I figure that that's -- because that

19  would have been the time that we were talking about the

20  debt.  That would have been 2009.  The first quarter

21  and the first half of the year is when we had the

22  realization, I guess would be a way to say it, that we

23  weren't going to make this happen.  It wasn't going to

24  work.  So we sat down with Ed Lloyd and told him our

25  pickle, and then over a handful of meetings we came up

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 32 of 35
USA Exhibit 4 Page 32
www.CapitalReportingCompany.com
202-857-3376

1   with a plan.

2           Q.   How do you know when the POA form was

3   signed?

4           A.   It was in a transcript.

5           Q.   What transcript?

6           A.   I don't know.  It was in an account -- that

7   document you referred to earlier.  I don't have them

8   handy.  I can't remember the names of them.

9           Q.   So you didn't see the --

10          A.   I'm sorry.  It's just the timing of it too.

11  You know, 2008 -- we found out the end of 2008 what the

12  liability was, and then we didn't get on his slate, I

13  don't think, until the first -- like, February or

14  something in that.  And then the power of attorney was

15  signed a few months later.

16          Q.   So I'm just trying to figure out the

17  timeline.  At the end of 2008 you figured out what the

18  liability was, right?

19          A.   Correct.

20          Q.   And then you met with Ed Lloyd about the

21  liability in June or July of 2009.  Is that what you're

22  saying?

23          A.   Yes.  Yeah.

24          Q.   And that's when you signed -- that's when

25  you think you signed the POA form?

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 33 of 35
www.CapitalReportingCompany.com        USA Exhibit 13 Page 33
202-857-3376

1        A.    Correct.

2        Q.    And that's not based on you seeing the POA

3   form.  That's based on an account transcript that you

4   saw?

5        A.    Yes.

6        Q.    Why did you wait so long to talk to Ed

7   Lloyd about it?

8        A.    I think at the time, you know, Christmas of

9   that year, we were still thinking that we were going to

10  be okay.  We were just -- and I'm going from memory

11  here.  We were just thinking the market was going to

12  turn because it was pretty volatile and it was going up

13  and down.  And then right in the first quarter I think

14  is when, if my memory is right, that everything tanked

15  big time.  I think that was the punch in the gut for us

16  and when we reached out in earnest to Ed to hire him

17  then.

18       Q.    Got it.  You mentioned that you filed an

19  extension of time to file your taxes, correct?

20       A.    Yes.

21       Q.    And that pushes the due date to around

22  October of the following year?

23       A.    Correct.

24       Q.    Is the payment also due at that time?

25       A.    I assume it is.  You know, it should be

1   sent in right away, I would think.  I never -- I would

2   depend on my CPA for that.

3          Q.   Okay.  I'm just trying to figure things

4   out.  You said that in June or July you figured that

5   you couldn't make the payment work, correct?

6          A.   Yeah.

7                  MR. CONNOR:  Objection, leading

8   question.

9   BY MR. MORTON:

10         Q.   But the payment was due in October, right?

11                 MR. CONNOR:  Objection to form.

12                 MR. MORTON:  It's a deposition.

13   There's no --

14   BY MR. MORTON:

15         Q.   When was the payment due?

16         A.   I'm not -- I don't know the -- I assume

17   when the taxes are done or as soon as possible, I would

18   assume.

19         Q.   So that would have been in October?

20         A.   They weren't done until -- I don't know --

21   the end of November, I think, by the time it got to us.

22         Q.   Got it.  So you didn't figure out that you

23   couldn't pay in around July 2009 then, did you?

24                 MR. CONNOR:  Objection to form.

25   BY MR. MORTON:

Case 3:20-cv-00579-TEJ-DCK   Document 31-4   Filed 09/19/22   Page 35 of 35
USA Exhibit B Page 35
www.CapitalReportingCompany.com
202-857-3376